**AMERICAN IRON AND STEEL INSTITUTE, Petitioner,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

American Petroleum Institute, Edison Electric Institute, et al., Intervenors.

**Nos. 88–1155, 88–1156, 88–1158, 88–1165, 88–1168 and 88–1169.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1989.

Decided Sept. 22, 1989.

Angus Macbeth, with whom Samuel I. Gutter, Washington, D.C., and Peggy L. O'Brien were on the brief, for petitioners Waste Management of North America and Chemical Waste Management in No. 88–1165.

William R. Weissman (for Edison Elec. Institute) and Karl S. Bourdeau (for American Iron & Steel Institute), with whom Gary H. Baise, Steven F. Hirsch, Washington, D.C., and Barton C. Green (for American Iron & Steel Institute), Richard A. Flye, Christian Volz, and Carole Stern, Washington, D.C. (for Fertilizer Institute), John F. Cermak (for PPG Industries), Douglas H. Green (for Edison Elec. Institute), G. William Frick (for American Petroleum Institute), and James K. Jackson, Washington, D.C., John H. Hanson, Donald J. Patterson, Jr., Washington, D.C., Aaron H. Goldberg, Edward M. Green, Roderick T. Dwyer, and Jeremiah J. Jewett III (for American Mining Congress and Solite Corp.) were on the joint brief, for petitioners/intervenors in Nos. 88–1155, 88–1156, 88–1158, 88–1168 & 88–1169.

Scott A. Schachter, Atty., Dept. of Justice, Washington, D.C., and Caroline Wehling, Atty., E.P.A. with whom Donald A. Carr, Atty., E.P.A. was on the brief, for respondent. Michael A. McCord, Atty., E.P.A., Columbus, Ohio, and Roger J. Marzulla, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondent.

Dean A. Calland and Donald C. Bluedorn II, Pittsburgh, Pa., were on the brief for petitioner Inland Steel Co. in No. 88–1168.

Thomas S. Llewellyn, Washington, D.C., entered an appearance for intervenor American Petroleum Institute in Nos. 88–1155, et al.

David R. Case, Washington, D.C., entered an appearance for amicus curiae Hazardous Waste Treatment Council in Nos. 88–1155, 88–1156 & 88–1158.

Before MIKVA and WILLIAMS, Circuit Judges, and WILL,* District Judge for the Northern District of Illinois.

Opinion for the court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Resource Conservation and Recovery Act ("RCRA"), Pub.L. No. 94–580, 90 Stat. 2795 (1976), created in its Subtitle C a system for control over the treatment, storage and disposal of hazardous wastes. RCRA §§ 3001–13, 42 U.S.C. §§ 6921–34 (1982) (current version at 42 U.S.C. §§ 6921–39a (1982 & Supp. IV 1986); see also RCRA § 1004(5), 42 U.S.C. § 6903(5) (1982) (defining "hazardous waste"). While invariably described as a "cradle-to-grave" system, it in fact reaches (as we shall see) well beyond the grave. It required owners and operators of hazardous waste treatment, storage and disposal facilities, here generally referred to simply as facilities or treatment facilities, to secure operating permits from the Environmental Protection Agency, RCRA §§ 3004–05; 42 U.S.C. §§ 6924–25 (1982), or from a state holding EPA authorization to issue permits, RCRA § 3006(b), 42 U.S.C. § 6926(b) (1982). In addition, RCRA Subtitle D established a regulatory program for nonhazardous solid wastes, with primary enforcement by the states. RCRA § 4001–09; 42 U.S.C. §§ 6941–49 (current version at RCRA §§ 4001–10, 42 U.S.C. § 6941–49a (1982 & Supp. IV 1986) [1]). See generally *United Technologies Corp. v. EPA*, 821 F.2d 714 (D.C.Cir.1987); *Environmental Defense Fund v. EPA*, 852 F.2d 1309, 1310–11 (D.C.Cir.1988).

As originally enacted, RCRA "did not require permittees to take significant remedial action to correct past mismanagement of hazardous waste." *United Technologies*, 821 F.2d at 717. In 1984 Congress decisively changed that focus with the Hazardous and Solid Waste Amendments ("HSWA"), Pub.L. No. 98–616, 98 Stat. 3224 (1984). This greatly increased EPA's authority to require corrective action, even for releases that occurred before the HSWA was enacted.

In 1985 EPA adopted a somewhat skeletal set of regulations, implementing the HSWA in terms that largely tracked the statutory language. *First Codification Rule*, 50 Fed.Reg. 28,702 (July 15, 1985). Under attack here is its 1987 *Final Second Codification Rule*, 52 Fed.Reg. 45,788 (Dec. 1, 1987), which adds critical detail to the earlier work, and, in the judgment of petitioners and intervenors, goes well beyond EPA's statutory authority. Our jurisdiction to review the EPA's regulations flows from RCRA § 7006(a), 42 U.S.C. § 6976(a) (1982). We will not try to summarize our holding here, as it is almost impossible to state the issues intelligibly without more detail than a summary could reasonably bear.

## I. Bevill–Bentsen Wastes

■ Many petitioners attack the regulations for their inclusion of so-called Bevill–Bentsen wastes among those subject to corrective action. We reject the claim. We read the Bevill–Bentsen provisions as intended merely to protect such wastes from undue burdens that might flow from their being overhastily classified as hazardous wastes; petitioners' reading of the statute would immunize them from burdens concededly imposed by Congress on *non*hazardous wastes.

Congress in October 1980 adopted the Bevill and Bentsen amendments as part of the Solid Waste Disposal Act Amendments of 1980, Pub.L. No. 96–482, 94 Stat. 2334 (1980). The Bevill amendment, RCRA § 3001(b)(3), 42 U.S.C. § 6921(b)(3) (1982), exempted particular mining industry wastes—now known as Bevill wastes—from the hazardous waste controls in RCRA Subtitle C, pending further study by EPA as to their environmental and health

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

**1.** RCRA has been heavily amended since 1980. Henceforth we omit citations to later amendments when the context makes it clear that we are discussing the original statute.

effects and a possible determination by EPA as to whether to apply Subtitle C or not. The exemption takes the form of providing that

> Notwithstanding [provisions authorizing the EPA to identify hazardous wastes to be subject to subtitle C regulation], each [Bevill] waste listed below shall ... be subject only to regulation under other applicable provisions of Federal or State law in lieu of this subchapter....

42 U.S.C. § 6921(b)(3)(A). The Bentsen amendment, RCRA §§ 3001(b)(2)(A), (C), 8002(m), 42 U.S.C. §§ 6921(b)(2)(A), (C), 6982(m) (1982), gave a similar exemption to oil, gas and geothermal production wastes—Bentsen wastes—except that if EPA determined that Subtitle C regulations were warranted, it was only to transmit them to Congress for possible adoption. RCRA § 3001(b)(2)(C), 42 U.S.C. § 6921(b)(2)(C) (1982). See generally *Environmental Defense Fund v. EPA*, 852 F.2d at 1314-15; *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1318-20 (D.C. Cir.1988).

When the EPA conducted the regulatory determinations required by the two amendments, it decided (with an exception) that both types of wastes should be regulated only as Subtitle D nonhazardous solid wastes. See 53 Fed.Reg. 25,446 (July 6, 1988) (Bentsen waste determination); *cf. Alaska Center for the Environment v. Reilly*, No. 88-1715, Order (D.C.Cir. Apr. 27, 1989) (dismissing challenge to Bentsen determination) *pet. for reh'g filed* June 12, 1989; *Environmental Defense Fund v. EPA*, 852 F.2d 1309 (D.C.Cir.1988) (upholding EPA decision regarding extraction and beneficiation mining wastes); *Environmental Defense Fund v. EPA*, 852 F.2d 1316 (D.C.Cir.1988) (ordering EPA to come to decision on mining processing wastes); *American Mining Congress v. EPA*, No. 88-1835, et al. (D.C.Cir. filed Nov. 29, 1988) (challenge to later EPA decision to list certain processing wastes as hazardous wastes).

The issue is whether these wastes are reached by § 3004(u) of RCRA, the source of EPA's authority to require corrective action:

> Standards promulgated under this section [RCRA § 3004, 42 U.S.C. § 6924] shall require, and a permit issued after November 8, 1984, by the Administrator or a State shall require, corrective action for all releases of *hazardous waste or constituents* from *any* solid waste management unit at a treatment, storage, or disposal facility seeking a permit under this subchapter, regardless of the time at which waste was placed in such unit....

RCRA § 3004(u), 42 U.S.C. § 6924(u) (Supp. IV 1986) (emphasis added).

The *Final Second Codification Rule* allows the agency to require sampling and study to determine the risk of release of hazardous wastes or constituents, see 52 Fed.Reg. 45,788, 45,799, codified at 40 CFR § 270.14(d), and to require appropriate corrective action, see *id.* at § 264.101. As § 3004(u) states, any solid waste management unit ("SWMU") at a facility seeking a permit is susceptible to these requirements, and the preamble to the *Final Second Codification Rule* specifies that such units are not exempt merely because Bevill–Bentsen wastes are the only possible source of hazardous constituents. The preamble states explicitly that EPA intends to exercise its § 3004(u) authority "on a case-by-case basis, writing permit conditions to require monitoring (or modeling) for any media [sic] where it finds that a SWMU is likely to release hazardous constituents that pose a threat to human health and the environment." 52 Fed.Reg. at 45,789/2. In confirming that this coverage encompasses Bevill–Bentsen wastes, the EPA stressed that § 3004(u) called for clean-up not only of hazardous "wastes" but also of hazardous "constituents." *Id.* at 45,790/1. It noted that the commenter asserting exemption of Bevill–Bentsen wastes had conceded that the section covered nonhazardous solid wastes, *id.;* counsel confirmed the concession at oral argument. Thus the issue boils down to whether the exempting language is powerful enough to afford Bevill–Bentsen wastes a uniquely privileged position, free from corrective action requirements

imposed on all other nonhazardous solid wastes generally regulated exclusively under Subtitle D.

It is quite true that the Bevill–Bentsen amendments allow regulation of the affected wastes only "in lieu of" Subtitle C. See RCRA § 3001(b)(3)(A), 42 U.S.C. § 6921(b)(3)(A) (1982) (Bevill); RCRA § 3001(b)(2)(A), 42 U.S.C. § 6921(b)(2)(A) (1982) (Bentsen). As § 3004(u) is the sole basis for EPA's corrective action requirement, and is indisputably located within Subtitle C, the linguistic case for exemption from corrective action is quite powerful.

We must at the outset reject one device by which the EPA proposes to defeat this claim. It suggests that because the HSWA added § 3000(u) only in 1984, that section logically falls outside the Bevill–Bentsen amendments' cross-references to Subtitle C. The argument seems palpably defective. If Congress exempts wastes from Subtitle C regulation, and then adds to Subtitle C, the normal understanding would be that the exemption covers the additions.

We note, however, that the language of § 3004(u), requiring "corrective action for all releases of hazardous waste or *constituents* from *any* solid waste management unit at a ... facility seeking a permit," sweeps far more broadly than the rest of Subtitle C, with its focus on hazardous waste. Moreover, the House Report explaining § 3004(u) not only focuses entirely on release of hazardous constituents, see H.R. Rep. 98–198, 98th Cong., 2d Sess., Pt. I, at 60, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5619, but explains that the section calls on the Administrator "to examine all units at the facility from which hazardous constituents might migrate, irrespective of whether the units were intended for the management of solid and/or hazardous wastes," *id.* Section 3004(u)'s focus on possible release of hazardous constituents, regardless of the absence of hazardous waste, suggests to us that it in no way implicates the concern that gave rise to Bevill–Bentsen: the disruption that would follow if the wastes were improvidently classified as hazardous.

Both the structure of the regulatory scheme and the legislative history of the Bevill–Bentsen amendments indicate that it was regulation of those wastes *as* hazardous wastes that Congress sought to restrict. The amendments establish a special process by which the EPA is to ascertain, for sure, whether the wastes are truly hazardous. As all *non*hazardous wastes are subject to corrective action requirements under § 3004(u), the study seems logically irrelevant to their imposition on Bevill–Bentsen wastes.

Moreover, the EPA and the joint petitioners agree that the amendments arose out of the apparent imminence of the wastes' being regulated as subtitle C hazardous wastes in EPA's May 1980 *Phase I Interim Status Standards*, 45 Fed.Reg. 33,084. See Joint Brief of Petitioners and Intervenors at 26 n. 21; Brief for Respondent at 10; see also 45 Fed.Reg. at 33,089 (EPA statement that 40 CFR § 261.4(b) will temporarily exclude Bevill–Bentsen wastes pending congressional action). Naturally enough, the floor discussion of the amendments stressed concern over their regulation as hazardous wastes. Representative Bevill, for example, explained that he knew of no evidence that the wastes "ever presented a 'substantial-hazard to human health or the environment,' the statutory standard for regulation as a hazardous waste." 126 Cong.Rec. 3361 (1980). See also 125 Cong.Rec. 13,242/1 (1979) (remarks of Sen. Randolph); *id.* at 13,244/2 (remarks of Sen. Bentsen); *id.* at 33,849/2–3 (remarks of Rep. Frost). Although petitioners call our attention to occasions on which sponsors spoke of the amendments as generally deferring "regulation" of the wastes, see 126 Cong.Rec. 3361/1, 3362/1 (1980) (remarks of Rep. Bevill), these appear amid more precise articulations of the goal as seeking to defer their regulation as hazardous wastes.

Petitioners' proposed interpretation of the amendments and § 3004(u) would lead to bizarre results. Not only would it make the imposition of corrective action requirements depend upon the outcome of a logically irrelevant inquiry, but it would elevate Bevill–Bentsen wastes to a privileged

position above all other nonhazardous solid wastes. Yet petitioners neither suggest a reason for such an elevation, nor point to any given by the amendments' sponsors. We read the amendments as giving Bevill–Bentsen wastes an exemption only from regulation as hazardous waste.

Petitioners also point, at least as far as Bevill wastes are concerned, to RCRA § 3004(x):

> If [Bevill waste] ... is subject to regulation under this subchapter [Subtitle C], the Administrator is authorized to modify the requirements of subsections (c), (d), (e), (f), (g), (o), and (u) of this section and section 6925(j) of this title, in the case of landfills or surface impoundments receiving such solid waste, to take into account the special characteristics of such wastes, the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including but not limited to the climate, geology, hydrology and soil chemistry at the site, so long as such modified requirements assure protection of human health and the environment.

RCRA § 3004(x), 42 U.S.C. § 6924(x) (Supp. IV 1986). Petitioners argue that the inclusion of subsection (u) among the provisions as to which Bevill wastes should receive special consideration, if they should be subjected to Subtitle C regulation generally, must reflect an assumption they will be exempt from § 3004(u) unless EPA makes the affirmative decisions required under the amendment. But § 3004(x) also makes sense under our reading of § 3004(u): to the extent that EPA imposes *special* § 3004(u) controls on hazardous wastes and classifies Bevill wastes as such, § 3004(x) allows the agency to adjust the regulations to the special features of Bevill wastes.

Accordingly, we reject petitioners' claim that the Bevill–Bentsen amendments exempt those wastes from the corrective action requirements that § 3004(u) authorizes for nonhazardous wastes.

**2.** Thus units with Bevill–Bentsen wastes are subject to corrective action under part I of this decision only if they are at a facility that requires a subchapter C permit. See *First Codification Rule,* 50 Fed.Reg. at 28,712/2.

## II. INCLUSION OF OWNER/OPERATORS SEEKING "POST-CLOSURE" PERMITS OR "PERMITS-BY-RULE"

Section 3004(u), it will be recalled, authorized corrective action requirements for units at a "treatment, storage or disposal facility seeking a permit under [subchapter C]." [2] The next two claims contest the EPA's interpretation of what behavior constitutes "seeking a permit" giving rise to a duty to take corrective action.

First, petitioner American Iron and Steel Institute and intervenor American Petroleum Institute challenge the EPA's view, expressed in the *Final Second Codification Rule,* 52 Fed.Reg. at 45,794/2–95/1, that the corrective action requirement covers facilities seeking "post-closure" permits as well as those seeking operating permits.

Second, petitioner Inland Steel Company contests the EPA's decision that the corrective action requirement extends to owner/operators of underground injection wells who receive one type of what are called "permits-by-rule"—in this case, permits issued under the underground injection control ("UIC") program of the Safe Drinking Water Act, 42 U.S.C. §§ 300f–300j–11 (1982 & Supp. IV 1986). The EPA deems such a permit to be a RCRA permit if the owner-operator has complied with RCRA regulatory requirements for wells injecting hazardous waste. See 52 Fed. Reg. at 45,791–92; see also 40 CFR § 270.60(b) (1988).

The EPA's three-part reply to both these challenges is (1) that they have already been adjudicated by this court in *United Technologies v. EPA,* 821 F.2d 714, 724–25 (D.C.Cir.1987), (2) that this court lacks jurisdiction because the claims are out of time, and (3) that petitioners are substantively mistaken. We find the first procedural objection correct as to the first claim (post-closure permits) and the second correct as to both. Accordingly we do not reach the merits.

*Issue Preclusion*

██ Petitioners acknowledge that in *United Technologies* the American Iron and Steel Institute and the American Petroleum Institute raised both these issues. Moreover, as the number of pages in their briefs testifies, the claims were scarcely an incidental part of their challenge to the *First Codification Rule.* See Joint Brief of Industry Petitioners and Intervenors at 37–44 and Joint Reply Brief of Industry Petitioners and Intervenors at 16–19, *United Technologies v. EPA*, 821 F.2d 714 (D.C. Cir.1987) (Nos. 85–1654 et al.). Inland Steel Company, however, was not a party to that suit. Thus, the doctrine of issue preclusion plainly cannot bar its claim here—the permit-by-rule contention.

Our opinion in *United Technologies* makes only two references that could relate to either issue, but the outcome of the decision makes clear the court rejected both contentions. One possible reference came at the start of the opinion, where we stated that

> [b]ased on our careful review of the Final Rule, and the arguments advanced by the parties, we conclude that the regulations promulgated by the EPA are, *for the most part*, reasonable and consistent with the 1984 Amendments. There is one aspect of the Final Rule, however, that is inconsistent with the plain meaning of the 1984 Amendments.

821 F.2d at 716 (italics in original). The "one aspect" concerned a matter unrelated to the two issues here. See 821 F.2d at 723–24.

The second, and unambiguous, reference to the permit issues came when we summarized our opinion as follows: "The various petitioners have raised a host of objections to the EPA's Final Rule. For the most part, we find these objections to be without merit." *Id.* at 725. While the comment was brief, the outcome of the case—denial of all relief except as to a clearly unrelated issue—necessarily constituted a rejection of the claims as to both post-closure permits and permits by rule. See Restatement (Second) of Judgments § 27 (1982) ("[w]hen an issue of ... law is actually litigated and

determined ... and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties"). Even in the absence of *any* opinion a judgment bars relitigation of an issue necessary to the judgment, see *National Classification Committee v. United States*, 765 F.2d 164, 171 (D.C.Cir.1985), so it is plain that the adjudicator's silence on the issue is relevant only insofar as it may tend to obscure whether the issue was truly litigated. Thus the American Iron and Steel Institute and the American Petroleum Institute have had their day in court on both issues.

*Subject Matter Jurisdiction*

██ Our decision in *United Technologies* does not preclude Inland Steel's petition regarding permits by rule, however, as Inland was not a party to the earlier proceeding nor in privity with any party. But Inland, and indeed the other claimants here, encounter a further obstacle, RCRA § 7006(a)(1)'s requirement that petitions for review of the EPA's regulations be filed within 90 days. 42 U.S.C. § 6976(a)(1) (1982).

The EPA first set out its understanding of the corrective action authority in its *First Codification Rule*, 50 Fed.Reg. 28,-702, 28,711/3–12/1 (post-closure permits), 28,715/2 (permits by rule) (July 15, 1985). Thus the time bar would normally be understood to have closed off any challenge by October 1985. Petitioners, however, rely on *Ohio v. EPA*, 838 F.2d 1325, 1328–29 (D.C.Cir.1988), under which the time for seeking review starts fresh at repromulgation if an agency *reopens* the issue by holding out the unchanged section as a proposed regulation, offering an explanation for its language, soliciting comments on its substance, and responding to the comments in promulgating the regulation in its final form. *Id.* at 1328; see also *Colorado Interstate Gas Co. v. FERC*, 850 F.2d 769, 772 (D.C.Cir.1988) (formal reconsideration by agency); *Association of American Railroads v. ICC*, 846 F.2d 1465, 1473 (D.C.Cir.1988) (agency announcement that it sought to harmonize inconsistent regulations).

Here the EPA mentioned its treatment of post-closure permits and permits by rule in the preamble of its *Proposed Second Codification Rule*, 51 Fed.Reg. at 10,715/3–16/1 (post-closure permits), 10,714/1–3 (UIC wells). But nowhere in these pages does the EPA reopen the question of *whether* permits by rule or post-closure permits should be treated as RCRA permits. Instead, the EPA asked for comments on the specific conditions that it proposed attaching to RCRA permits by rule, notably *information-gathering* that the agency sought to compel permittees to conduct, see *id.* at 10,714/3, and addressed refinements within the coverage of post-closure permits, see *id.* at 10,715/3–16/1. The EPA discussion lacked any sustained attempt to reiterate the reasons it had offered less than two years earlier. In the *Final Second Codification* Rule the EPA noted briefly that it had received comments suggesting that permits by rule should not be RCRA permits for § 3004(u); it responded by stating that it "reaffirm[ed]" its previous position and at most briefly reiterated its prior reasoning. See 52 Fed. Reg. at 45,792/3–93/1. As to post-closure permits, EPA's response focused on other issues. *See id.* at 45,794/2.

The "reopening" rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue. To so read *Ohio v. EPA* would undermine congressional efforts to secure prompt and final review of agency decisions. We conclude therefore that we are without jurisdiction to hear either claim.

### III. The Nature of "Closure"

From 1983 until adoption of the *Final Second Codification Rule*, the EPA's formal statement of the scope of the RCRA permit requirement read as follows:

> *Scope of the RCRA Permit Requirement.* RCRA requires a permit for the "treatment," "storage," or "disposal" of any "hazardous waste" as identified or listed in 40 CFR Part 261.... Owners

and operators of hazardous waste management units must have permits *during the active life (including the closure period)* of the unit, and for any unit which *closes* after January 26, 1983, during any post-closure care period required under § 264.117 [regulations for post-closure care and use of property, including 30 years of monitoring] and during any compliance period specified under § 264.96 ["the number of years equal to the active life of the waste management area (including any waste management activity prior to permitting, and the closure period.)"], including any extension of the compliance period under § 264.96(c).

40 CFR § 270.1(c) (1986) (emphasis added), 48 Fed.Reg. 14,228, 14,229 (Apr. 1, 1983), *amended,* 48 Fed.Reg. 30,113, 30,113 (June 30, 1983). Though the rule makes closure pivotal, it plainly does not define the term nor reveal when an owner/operator can be said to have accomplished it.

In the *Final Second Codification Rule* the EPA replaced the above with language carrying a broader reach:

> *Scope of the RCRA Permit Requirement.* RCRA requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" as identified or listed in 40 CFR Part 261.... Owners and operators of hazardous waste management units must have permits during the active life (including the closure period) of the unit. Owners or operators of surface impoundments, landfills, land treatment units, and waste pile units that received wastes after July 26, 1982, or [1] *that certified closure (according to § 265.115) after January 26, 1983,* must have post-closure permits, [2] *unless they demonstrate closure by removal as provided under § 270.1(c)(5) and (6).* If a post-closure permit is required, the permit must address applicable Part 264 Groundwater Monitoring, Unsaturated Zone Monitoring, Corrective Action, and Post-closure Care Requirements of this chapter....

40 CFR § 270.1(c) (1988), 52 Fed.Reg. at 45,798 (emphasis added).

We now consider two sets of objections to the new language. One regards the first emphasized passage, which exempts certain owner/operators only if they *certified* closure by January 26, 1983. The other regards the second emphasized passage, which (through a series of cross references) has the effect of exempting owner/operators that "closed by removal" (i.e., by extracting the waste and shipping it elsewhere) *only* if their removal satisfied the part 264 standards, which are far more stringent than the part 265 "interim status" standards.

### A. *Closure by certification v. mere cessation of receipt of waste.*

Several petitioners and intervenors (whom we refer to simply as petitioners) oppose the revision of § 270.1(c) contained in the *Final Second Codification Rule* on the grounds that it was adopted in final form without proper notice and comment, that the EPA lacked statutory authority to promulgate the amendment, and that it was arbitrary and capricious. At issue, in substance, is the EPA's imposition of post-closure permitting requirements on facilities that ceased receiving wastes before July 26, 1982 but failed to certify final closure to the EPA, as set out in 40 CFR § 265.115, until after January 26, 1983. We shall call these facilities the "early cessation-late certification facilities." The EPA's authority to require post-closure permits from facilities that continued receiving wastes *after* the earlier date ("late cessation-late certification") is not at issue because coverage of late cessation facilities is explicitly mandated by the HSWA's addition of § 3005(i) to RCRA:

**Interim status facilities receiving wastes after July 26, 1982.**

The standards concerning ground water monitoring, unsaturated zone monitoring, and corrective action, which are applicable under section 6924 of this title [RCRA § 3004] to new landfills, surface impoundments, land treatment units, and waste-pile units required to be permitted under [RCRA § 3005(c)] shall also apply to any landfill, surface impoundment, land treatment unit, or waste-pile unit qualifying for the authorization to operate under [RCRA § 3005(e), regarding interim status facilities] which receives hazardous waste after July 26, 1982.

RCRA § 3005(i), 42 U.S.C. § 6925(i) (Supp. IV 1986).

Moreover, the *Proposed Second Codification Rules* plainly purported to cover late-cessation facilities, see *Proposed Second Codification Rule*, 51 Fed.Reg. 10,706, 10,715/3 (Mar. 28, 1986), so that as to them there can be no claim of defective notice.

The dates originate with EPA's *Interim Final Rules* for RCRA. 47 Fed.Reg. 32,274 (July 26, 1982). EPA published these on July 26, 1982 (which we will sometimes refer to as "the earlier date"), to take effect on January 26, 1983 (sometimes referred to as "the later date").

■ Petitioners' notice and comment argument arises out of the indisputable point that the *Final Second Codification Rule*'s version of § 270.1(c) differed radically from the language of the proposed rule. Although the *Proposed Second Codification Rule* expanded the post-closure permit requirement to include facilities that continued to receive waste after the earlier date (late-cessation facilities), 51 Fed.Reg. 10,706, 10,715 (Mar. 28, 1986), it did not discuss early cessation-late certification facilities. Indeed language in the preamble to the *Proposed Second Codification Rule* suggested that EPA did not believe that the post-closure permit requirement applied to any facilities that ceased receiving waste before the earlier date: it stated that its change was needed because existing rules "subjected such units to these requirements only if they received waste after [the later date]." *Id.* As we will see, petitioners seek to hold the EPA to this characterization of the status quo ante. Among EPA's several replies is the claim that its 1986 statement about the status quo ante was inaccurate when made, and that the language of the *Final Second Codification Rule,* denying relief to early cessation-late certification facilities, was no

more than explicit confirmation of the true status quo ante.

As is doubtless apparent by now, closure is an elastic concept. A considerable period of time may pass between when a facility ceases to receive waste and when its management elects to make a certification of closure, as required under 40 CFR § 265.115 (1988). See, e.g., Brief of Petitioners Waste Management of North America, Inc. and Chemical Waste Management, Inc. at 12 ("several years frequently pass between the last receipt of waste and certification of closure"). Evidently a substantial number of facilities received no waste after the earlier date but did not certify closure until after the later date.

The heart of EPA's position (or at least of one of its positions) is that at some time well before the *Proposed Final Second Codification Rule,* it had established, as the true meaning of the then-existing version of 40 CFR § 270.1(c), that late-certification facilities were required to obtain a post-closure permit regardless of when they had stopped receiving waste. See *Final Second Codification Rule,* 52 Fed. Reg. at 45,794/3–95/1 (Dec. 1, 1987). In the preamble to the final rule, EPA therefore noted its agreement with commentators who viewed the *Proposed Second Codification Rule* as having the unintended effect of *relaxing* the post-closure permit requirement for early cessation-late certification facilities. See *id.* Thus it explained the final rule's explicit coverage of early cessation-late certification facilities as a mere correction of an inadvertently created "loophole," and observed that "the term 'closure' in this context has been clarified to mean certification of closure according to § 265.115." *Id.* at 45,795/1. If indeed 40 CFR § 270.1(c) had by 1986 acquired the meaning that EPA asserts, then, despite the blunder of the proposed rule, a simple retreat to the status quo ante can properly be viewed as a "logical outgrowth" of the proposed rule. See *NRDC v. Thomas,* 838 F.2d 1224, 1242–43 (D.C.Cir.1988). One logical outgrowth of a proposal is surely, as EPA says, to refrain from taking the proposed step.

We will spare the reader a review of all the regulatory product that, in EPA's view, established the notion that closure for these purposes meant certification. In fact, at least to some members of the panel, utterances claimed by EPA to assert that meaning actually assert or imply the opposite. Nonetheless, assuming the worst of the pre–1985 materials, we believe that by 1985, in the *First Codification Rule,* EPA did in fact formally adopt the view it now espouses.

As part of its discussion of the exact issue in question here—the scope of the post-closure permit requirements—the EPA stated that "facilities which closed before January 26, 1983, are not required to obtain post-closure permits." 50 Fed. Reg. at 28,712. In a footnote to that sentence, the EPA provided what was undoubtedly its clearest definition of closure before the 1987 "clarification":

> It should be noted that "closure" in this context does not mean simply ceasing to place waste in a unit. Closure, as a regulatory concept under these rules, is a proceeding during which EPA determines, after public review, that the facility has an adequate closure plan and that the facility implements that plan. Thus, closure is not complete under the hazardous waste regulations until a certification of closure has been given under 40 C.F.R. § 265.115.

*Id.* at 28,712 n. 14.

A single footnote tucked away in the Federal Register in minuscule type is far from the best means of giving notice of an important change in policy. Compare *National Air Transportation Ass'n v. McArtor,* 866 F.2d 483, 485 (D.C.Cir.1989) (holding that preamble with misleading bold-faced headings and summary paragraphs could not provide constructive notice even though a "thorough and alert reader" could have deduced its true effects), with *Williston Basin Interstate Pipeline Co. v. FERC,* 874 F.2d 834, 836–37 (D.C.Cir.1989) (holding surcharge exemption contained in footnote to attachment to pipeline's effective tariff is covered by filed rate doctrine). Moreover, as the subjection of early cessa-

tion-late certification facilities to corrective action requirements cannot rest on the HSWA (§ 3005(i) addresses only late cessation facilities), petitioners argue that the footnote did not belong in purported implementations of HSWA. "Petitioners had no reason to look in a HSWA codification rule for a regulatory change not based on HSWA." Reply Brief of Petitioners and Intervenors at 22. Indeed, the EPA failed to cite any statutory or even prior regulatory authority in the footnote.

We are not persuaded by the claim of inadequate notice of the 1985 clarification. Apart from the *First Codification Rule*'s focus on the HSWA, petitioners suggest nothing in its captions, headnotes or other features that would, as in *National Air Transport Ass'n*, have erroneously caused an affected party to put the material down before reaching the critical passage. And the headnotes' attention to the HSWA does not appear deceptive in the present context. The HSWA was simply a set of *amendments* of RCRA; anyone subject to RCRA knew that, as a general matter, any regulations implementing HSWA necessarily carried serious risks for him.

Accordingly we accept EPA's contention that the explicit definition of closure in its 1987 version of 40 CFR § 270.1(c) was indeed no more than a formal restatement of what it had established no later than 1985, and thus may be viewed as a logical outgrowth of the proposal to amend § 270.1(c).

■ The argument that § 270.1(c) exceeded EPA's statutory authority rests essentially on one point: when the EPA, in the *Final Second Codification Rule*, 52 Fed.Reg. at 45,794–95, confirmed its 1985 position that closure meant certification, its only assertion of statutory authority remained the proposed rule's mention of § 3005(i), see 51 Fed.Reg. at 10,715/3, a reference that was clearly of no use as it covered only late-cessation facilities.

Although EPA did not cite specific statutes for the post-closure permit requirement, it did (at 52 Fed.Reg at 45,794/2) cite passages of the preamble to its *Interim Final Rules*, 47 Fed.Reg. 32,274, 32,291/3–92/1, 32,336/1 (July 26, 1982), at which it

had rested its post-closure permit requirements squarely upon RCRA § 3004, 42 U.S.C. § 6924 (renumbered RCRA § 3004(a), 42 U.S.C. § 6924(a), after the adoption of the HSWA). This section directs the agency to establish standards for treatment, storage or disposal of hazardous waste. In the preamble to the 1982 rules, it had argued that permits were no more than a device for tailoring the § 3004 standards to the precise specific conditions. Thus EPA may fairly be said to have explicitly, though indirectly, rested the coverage of late cessation-late certification units on 42 U.S.C. § 6924(a) (Supp. IV 1986).

Finally, petitioners contend that the amendment of 40 CFR § 270.1(c) was arbitrary and capricious because EPA failed to justify "its abrupt reversal" of the position that "closure" was achieved by a facility's ceasing to receive wastes. See Joint Brief of Petitioners and Intervenors at 65–68. Naturally this falls, given our view of the regulation's history.

We therefore reject the petitioners' challenge to EPA's application of the post-closure permit requirement to facilities that ceased receiving waste before the earlier date but certified closure after the later date.

### B. *"Closure by Removal"*

■ Certain facilities quite lawfully executed "closure by removal" (i.e., by extraction of the hazardous wastes) under "interim status" regulations applicable in 1980–87. Under the current regulations, EPA rejects this form of closure as a basis for exemption from corrective action requirements, and accepts closure by removal as a basis for exemption only if it satisfies certain more stringent removal standards. Several petitioners and intervenors, again simply referred to as petitioners, attack this decision.

Under RCRA as it existed before the HSWA of 1984, certain facilities that were already in existence when the interim RCRA standards took effect on November 19, 1980, and which complied with certain other requirements, were eligible for "in-

terim status" upon applying for a permit—i.e., could continue to operate, just as if they had a permit. RCRA § 3005(e), 42 U.S.C. § 6925(e) (1982). HSWA expanded the scope of interim status to reach facilities that were subject to RCRA only because of HSWA itself. See 42 U.S.C. § 6925(e)(1) (Supp. IV 1986).

The interim RCRA regulations in effect between 1980 and 1987 imposed no post-closure care responsibilities on interim status facilities that closed by removal ("clean closure") as provided in the Part 265 interim standards. See, e.g., 40 CFR § 265.228(b) (1986) (exempting surface impoundments from post-closure requirements if none of remaining wastes are "hazardous wastes"). Complying facilities were free to leave the RCRA regulatory system and to use or convey the property for any other purpose. See § 265.119 (1988) (provisions designed to alert purchasers to history as waste facility). Facilities closing under this program were required to certify final closure according to § 265.115. See 40 CFR § 265.112(a) (1988); see also 40 CFR at note foll. § 265.120 (1986) (giving former version of § 265.112(a)).

In the *Proposed Second Codification Rule* EPA proposed to amend § 270.1(c) to impose corrective action requirements on facilities that received waste after July 26, 1982 and closed by removal under interim standards, unless they could show that they had not only removed all hazardous wastes (thus satisfying the interim standard), but also removed all hazardous constituents (as required by part 264, the standard applicable to permitted facilities). 51 Fed.Reg. at 10,716/1–2, 10,722. EPA rested the change on the language of § 3005(i), quoted in full at p. 399, *supra*, which provides that whatever corrective action requirements apply to fully permitted facilities should also reach interim status facilities that received waste after July 26, 1982. Essentially it argued that Congress's concerns would not be met unless removal encompassed hazardous constituents as well as hazardous wastes. (As we have seen, the former may be present without the latter.) The *Final Second Cod-*

*ification Rule* also adopted this view. See 52 Fed.Reg. at 45,798–99.

Petitioners complain that § 3005(i) does not give the EPA the authority to impose such a retroactive post-closure burden on facilities that lawfully closed under the interim status provisions. The argument rests on the entirely accurate point that § 3005(i) does not mention "closure or permits." Accurate, but inconsequential. Section 3005(i) provides that the new corrective action requirements "shall also apply" to any unit "[1] qualifying for the authorization to operate under [the interim status provisions] [2] which receives hazardous waste after July 26, 1982." We do not understand petitioners to assert that the units in dispute fail to meet both those criteria. It is obviously true that for a unit that closed by removal under the interim standards in 1983, for example, "qualifying" for interim status on the date of HSWA's enactment in 1984 would (apart from this provision) have appeared to be no more than an irrelevance of ancient history. But unless Congress assumed that closure would always be interminable, it must have supposed that such units would be retroactively swept under the stricter requirements. As for "permits," the petitioners do not here contest the general proposition that post-closure permitting requirements are a reasonable method for implementing the substantive burdens Congress imposed.

Petitioners argue that the EPA's reading of § 3005(i) drastically disrupts the status quo. Once a unit is closed by removal under interim status it becomes eligible for sale or new construction. Subjection to the corrective action duties (or attaining exemption by compliance with the more stringent closure by removal standards) may be especially burdensome for such units and may upset expectations derived from completing closure by removal under the interim standards. Petitioners suggest accordingly that it would be more reasonable to construe the statute to exempt them. Assuming that finding such an implied exemption would be permissible, however, we certainly cannot say that EPA's more literal reading is impermissible. Accordingly, we must affirm.

## IV. AUTHORITY TO ISSUE POST-CLOSURE PERMITS IN STATES THAT HAVE § 3006(b) AUTHORIZATION

■ RCRA allows states to apply for authorization to administer their own hazardous waste programs in lieu of the EPA's. EPA must approve the state's request if the state's program is equivalent to and consistent with the federal one and if it provides adequate enforcement. See RCRA § 3006(b), 42 U.S.C. § 6926(b) (Supp. IV 1986). EPA's HSWA powers, however, do not automatically devolve to states with § 3006(b) authorization. Instead, the EPA must retain the responsibility for administering and enforcing HSWA requirements until states—even those with § 3006(b) approval—can demonstrate that they are prepared to undertake the specific tasks HSWA mandates:

> Any requirement or prohibition which is applicable to the generation, transportation, treatment, storage, or disposal of hazardous waste and which is imposed under this subchapter pursuant to the amendments made by the Hazardous and Solid Waste Amendments of 1984 shall take effect in each State having an interim or finally authorized State program on the same date as such requirement takes effect in other States. The Administrator shall carry out such requirement [sic] directly in each such State unless the State program is finally authorized (or is granted interim authorization as provided in paragraph (2)) with respect to such requirement.

RCRA § 3006(g)(1), 42 U.S.C. § 6926(g)(1) (Supp. IV 1986). As a result, in a state that enjoys § 3006(b) authorization, the first step in determining whether relevant permitting and enforcement is to be conducted by federal or state regulators is to inquire whether the EPA's authority to issue a given requirement rests on the 1984 HSWA or on other, pre-HSWA authority.

Earlier we upheld the EPA's statutory authority to require early cessation-late certification facilities to seek RCRA post-closure permits. See § III.A above. Petitioners Waste Management of North America, Inc. and Chemical Waste Management, Inc., though joining in the unsuccessful contention on that issue, request in the alternative that we declare that the agency's sole authority for "permits required by the Second Codification Rule" is the HSWA. Petitioners here appear most alarmed by a passage in the preamble that concludes:

> In many cases EPA will be able to defer to the States in their efforts to implement their programs, rather than take separate actions under Federal authority.

52 Fed.Reg. 45,788, 45,796.

We find the issue as posed extremely ambiguous. There *appears* to be no dispute between the parties that substantive corrective action requirements resting on the HSWA, listed by EPA at 40 CFR § 270.1(j) (1988), must be enforced exclusively by the EPA in the absence of specific authorization under § 3006(g). *Cf.* 40 CFR § 271.24 (1988) (procedure for interim § 3006(g) authorization). Insofar as the preamble passage cited by petitioners may suggest the contrary, the EPA repudiates it as "a single sentence . . . taken out of context." EPA Brief at 71. We take this repudiation as authoritative and binding. We cannot be in the position of "reviewing" preamble language whose meaning is obscure to begin with and which the agency neither explicates nor defends when challenged. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (ripeness doctrine is intended to protect the courts "from entangling themselves in abstract disagreements over administrative policies").

Apart from the dispute over preamble chaff, we take petitioners to argue that because the application of a post-closure permit requirement to early cessation-late certification facilities appeared (as they see it) only in the *Final Second Codification Rule*, it must rest on HSWA. In fact, we have found that the EPA made that ruling in the *First Codification Rule*, in the much disputed footnote. That presumably leaves their claim the same, as the latter was also promulgated primarily to implement HSWA.

On its face, however, this aspect of petitioners' claim is puzzling. All agree that the requirement of a post-closure permit for such facilities *cannot* rest on HSWA itself, for § 3005(i) speaks only to late cessation facilities. See III.A above. Thus, insofar as petitioners' claim relates to *substantive* requirements that do not derive from HSWA, we are puzzled as to the basis for supposing that such non-HSWA requirements would be covered by § 3006(g)'s insistence on federal enforcement. However, once we put aside the now repudiated preamble passage, it seems plain that the rules here under review said nothing on this jurisdictional issue; accordingly we do not address it. See *Abbott Laboratories*, 387 U.S. at 148–49.

## V.

In summary, we affirm the EPA on most, but not all, points. The EPA may impose HSWA corrective action requirements on Bevill–Bentsen wastes even though such wastes are exempt from regulation as hazardous waste under RCRA Subtitle C. We reject as untimely petitioners' claims that § 3004(u) does not encompass post-closure permits or permits by *rule*. And we uphold the EPA's amendment of the RCRA permit scope requirement, 40 CFR § 270.1(c), insofar as it requires post-closure permits from facilities that closed before July 26, 1982 but failed to certify closure before January 26, 1983 and insofar as it embraces facilities that closed by removal under part 265 interim status rules but received hazardous waste after July 26, 1982. We can identify no ripe issue relating to matters of federal as against state permitting authority.

*So ordered.*