In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 12-3388

CLEAN WATER ACTION COUNCIL OF NORTHEASTERN
WISCONSIN, INC., *et al.*,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*.

_____

Petition for Review of an Order of the
Environmental Protection Agency

_____

ARGUED SEPTEMBER 23, 2013 — DECIDED AUGUST 29, 2014

_____

Before EASTERBROOK, SYKES, and TINDER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. The Clean Air Act, 42 U.S.C. §§ 7401–7671q, invites each state to craft a plan (a "state implementation plan") to control the levels of certain air pollutants. Most state plans include "Prevention of Significant Deterioration" (PSD) programs. These programs are designed to prevent backsliding in "attainment areas" (regions that meet or exceed the Act's air quality standards), while still

allowing some new sources of pollution. A PSD program prevents designated sources from propelling the region's aggregate emissions over specified limits. The Act establishes these limits by setting a baseline and then a cap on pollutants above that baseline. The space between the baseline and the cap is the "increment". In the jargon of the regulations, new sources that create a net increase in emissions "consume increment". To simplify matters, we refer to the increment as the state's pollutant allowance. The Act grandfathers sources operational before 1975: the baseline incorporates their emissions, with post-1975 sources counting against the allowance. See 42 U.S.C. §7479(4).

Title V of the Act, 42 U.S.C. §§ 7661–7661f, requires each covered stationary source to have an operating permit. Permits implementing Title V specify pollution-control obligations for each source. The statute allows states to administer certain aspects of the air-pollution-control regime—including Title V permits—subject to federal review.

In 2002 Georgia-Pacific asked Wisconsin to renew the Title V permit for its pre-1975 paper mill. While Wisconsin weighed that application, Georgia-Pacific modified a paper machine at the plant. The application for a permit authorizing this modification was unopposed, and the permit issued in February 2004. In 2011 Wisconsin reissued the whole plant's operating permit. Clean Water Action Council asked EPA to reject the state's decision, arguing that Wisconsin's regulations (and their application to Georgia-Pacific) incorrectly implemented the Act. The Council believes that modifications to any part of a plant, such as the one Georgia-Pacific made in 2004, require all emissions from the plant—including pre-1975 emissions incorporated into the base-

line—to count against the state's allowance. If that's so, the whole plant might need to close for lack of available allowance. But EPA declined to object, see *In re Georgia Pacific Consumer Products LP Plant*, 2012 EPA CAA Title V LEXIS 7 (July 23, 2012), concluding that Wisconsin's approach is consonant with the agency's understanding of the statute: Modifications to pre-1975 sources do not mean that the whole plant's emissions count against the state's allowance. Only increases caused by the modifications count, the EPA concluded. After the agency published that order, the Council sought review under 42 U.S.C. §7607(b).

Jurisdiction comes first. EPA argues that the Council necessarily challenges the regulations (75 Fed. Reg. 64,864 (Oct. 20, 2010)) that say which permits may be renewed. Section 7607(b) requires that challenges to "nationally applicable regulations" be brought before the D.C. Circuit, while challenges to actions that are "locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit". The statute also requires that both kinds of challenge begin within 60 days of a regulation's publication. EPA contends that this court lacks jurisdiction because the Council brought the challenge belatedly and in the wrong circuit. Opinions from the Tenth and D.C. Circuits support the agency's stance. See *Utah v. EPA*, 750 F.3d 1182, 1184 (10th Cir. 2014); *Oklahoma Department of Environmental Quality v. EPA*, 740 F.3d 185, 191 (D.C. Cir. 2014); *Medical Waste Institute v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011); *Motor & Equipment Manufacturers Association v. EPA*, 142 F.3d 449, 460 (D.C. Cir. 1998); *Edison Electric Institute v. EPA*, 996 F.2d 326, 331 (D.C. Cir. 1993); *Natural Resources Defense Council v. NRC*, 666 F.2d 595, 602 (D.C. Cir. 1981).

We conclude, to the contrary, that the venue and filing provisions of §7607(b) are not jurisdictional. The EPA disregards the Supreme Court's many opinions discussing the difference between jurisdictional and claim-processing rules. See, e.g., *Sebelius v. Auburn Regional Medical Center*, 133 S. Ct. 817, 824–26 (2013); *Henderson v. Shinseki*, 131 S. Ct. 1197, 1202–06 (2011); *Reed-Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–66 (2010). See also *Webster v. Caraway*, No. 14-1049 (7th Cir. Aug. 1, 2014), slip op. 7–11. Venue rules have long been understood as non-jurisdictional. See *Leroy v. Great Western United Corp.*, 443 U.S. 173, 180 (1979). The Supreme Court also has held that most filing deadlines are statutes of limitations or claim-processing rules. See *Auburn*, 133 S. Ct. at 824–25 (listing cases); *Henderson*, 131 S. Ct. at 1203 ("Filing deadlines, such as the 120-day filing deadline at issue here, are quintessential claim-processing rules."); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510–16 (2006); *Eberhart v. United States*, 546 U.S. 12 (2005); *Kontrick v. Ryan*, 540 U.S. 443, 452–56 (2004). While there is an exception when it comes to appeals from district courts, see *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (interpreting 28 U.S.C. §2107), the Court has rejected arguments that other filing deadlines are jurisdictional. *Henderson*, 131 S. Ct. at 1203. Instead, "[t]he Court's recent cases require a 'clear statement' or 'clear indication' from Congress before a statute prescribing a precondition to bringing suit will be construed as jurisdictional." *Miller v. FDIC*, 738 F.3d 836, 844 (7th Cir. 2013).

Neither EPA nor Georgia-Pacific points to such a statement; we couldn't find one. The circuit-level decisions we have cited do not do so either. *Utah v. EPA* does not give a reason; it cites *Oklahoma Department of Environmental Quality* as authoritative. *Oklahoma Department of Environmental Quali-*

*ty* does not give a reason; it cites *Medical Waste Institute* as authoritative. *Medical Waste Institute* does not give a reason; it cites *Motor & Equipment Manufacturers Association* as authoritative. And so the chain of citations goes, until we reach *Natural Resources Defense Council*—which does give a reason (in addition to citing five more decisions, dating to 1974). When addressing the Hobbs Act, 28 U.S.C. §2344, the court tells us that a

> time limit [for initiating a contest to a regulation], like other similar limitations, serves the important purpose of imparting finality into the administrative process, thereby conserving administrative resources and protecting the reliance interests of regulatees who conform their conduct to the regulations. These policies would be frustrated if untimely procedural challenges could be revived by simply filing a petition for rulemaking requesting rescission of the regulations and then seeking direct review of the petition's denial.

666 F.2d at 602 (footnote omitted). This is exactly the sort of thing that the Supreme Court has held does *not* mark a rule as jurisdictional. *NRDC* tells us why the Hobbs Act and similar laws, such as §7607(b), contain time limits, not why filing deadlines are jurisdictional. The law is full of time limits, which serve valuable functions, but they are enforced when their beneficiaries bring them to the court's attention and stand on their rights; there is no need to declare them "jurisdictional," which means that they must be considered ahead of all other issues, even if all litigants forfeit, or even waive, their benefits. Any contention along the lines of "time limits are beneficial, so they must be jurisdictional" did not survive *Kontrick* and its successors, such as *Henderson* and *Auburn*.

Congress could have framed the filing and venue rules in jurisdictional terms, but it did not. Section 7607(b) does not

mention jurisdiction. *Auburn*, 133 S. Ct. at 824–25; *Henderson*, 131 S. Ct. at 1204–05; *Miller*, 738 F.3d at 844–45; *Webster*, slip op. 7–8. Nor does §7607(b) use language that is traditionally understood as jurisdictional. And the Supreme Court has not indicated that the §7607 filing deadline is jurisdictional. That the Council did not bring its claim within 60 days of the regulation's publication (or in the D.C. Circuit) therefore does not affect this court's jurisdiction.

Because our decision creates a conflict among the circuits on the question whether the timing and venue rules in §7607(b) are jurisdictional, it has been circulated to all judges in regular active service. See Circuit Rule 40(e). None requested a hearing en banc.

The 60-day limit remains a binding rule, however, as does the venue requirement—and EPA has invoked the benefit of each. But although jurisdiction must be resolved ahead of other issues, see *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), there is no necessary priority among non-jurisdictional issues. The EPA's contention that this challenge to a permit (and to one state's regulation) is "really" or "necessarily" a contest to a nationally applicable federal regulation would take the court into difficult ground. Cf. *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007). And for no good reason; the meaning of the statute is more important than what the Council's argument implies about some regulation. Because the EPA's decision can be sustained without deciding whether the Council's contentions necessarily undercut a federal regulation, we start (and end) with a discussion of the statute.

The language that matters is in 42 U.S.C. §7479(4):

[1] The term "baseline concentration" means, with respect to a pollutant, the ambient concentration levels which exist at the time of the first application for a permit in an area subject to this part … . [2] Such ambient concentration levels shall take into account all projected emissions in, or which may affect, such area from any major emitting facility on which construction commenced prior to January 6, 1975, but which has not begun operation by the date of the baseline air quality concentration determination. [3] Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975, shall not be included in the baseline and shall be counted against the maximum allowable increases in pollutant concentrations established under this part.

We have added the numbers in brackets to facilitate parsing the statute.

The Council argues that §7479(4) is clear. According to it, the third sentence means that the 2004 modifications require reallocating the entire plant's emissions toward Wisconsin's pollutant allowance. Section 7479(2)(C) tells us that "construction" includes modifications, and the Council sees in sentence 3 a rule that to modify one machine is to modify the whole plant. If the plant has been modified, it is a new source that can operate only if enough new allowance is available. EPA, on the other hand, reads sentences 2 and 3 together to mean that the pre-1975 emissions remain as part of the baseline, while any new emissions attributable to the 2004 modifications are counted toward the pollutant allowance. The statute does not explicitly address the treatment of emissions from a plant, only one part of which has been modified (and thus is treated as a new source). EPA concludes that the statute is ambiguous and the doctrine announced in *Chevron* calls for courts to respect the agency's

interpretation. See *Chevron USA Inc. v. Natural Resources De-fense Council, Inc.*, 467 U.S. 837 (1984). The Council concedes that, if the EPA is right on the law, or if *Chevron* applies, then Georgia-Pacific is entitled to its permit.

The statute is not as clear as the Council believes it to be. Two things are plain: (1) Emissions from pre-1975 sources, up to the 1975 level, count as part of the baseline and not toward the overall emissions allowances (sentences 1 and 2); (2) Emissions from post-1975 modifications to pre-1975 sources (in this case, the modified paper machine) count against a state's pollutant allowance (sentence 3). But the statute does not tell us what happens to the pre-1975 plant and its other machines, or whether a modification changes the relation between the baseline and the new allowance. Sentence 3 could be read to mean that modifications to pre-1975 sources require counting emissions previously included in the baseline against the state's allowance. But this is an interpretation, not the only interpretation. It is no less reasonable to read sentence 3 as counting only the marginal emissions from modifications to pre-1975 sources. Pre-1975 emissions remain in the baseline while emissions from post-1975 construction count toward a state's pollutant allowance. This is the interpretation that EPA has adopted. See 43 Fed. Reg. 26,388 at 26,400–01 (June 19, 1978); 75 Fed. Reg. 64,864 at 64,869 (Oct. 20, 2010). And "an agency's reasonable interpretation of ambiguous statutory language" carries the day. *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1603 (2014).

EPA's is a sensible interpretation as well. The Council's approach could produce two undesirable outcomes. Under one understanding of the Council's view, the 1975 baseline

would keep changing as old plants become "new." Every time a company modified a pre-1975 plant, all of the emissions that formerly were part of the baseline would now have to be counted against a state's allowance. This would cause no end of trouble during the permitting process for all plants (and not only the pre-1975 plant with modifications), because the region's baseline would be changing. Unless what was removed from the baseline were added to the allowance, other businesses could find themselves with no allowance to draw on. The other understanding of the Council's view involves double counting a "new" source's emissions. Rather than moving all the pre-1975 emissions from the baseline, a modification could cause the pre-1975 emission to count against the state's allowance and remain in the baseline. While this sounds strange, it is consistent with the Council's position. Under either interpretation companies (and state regulators) would be inclined to reject physical or operational changes to pollution sources, even if those changes *reduced* pollution, lest all pre-1975 emissions count against the state's allowance. The EPA's approach avoids that result.

EPA presents a reasonable interpretation of an ambiguous statutory provision. The petition for review is

DENIED.